**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

MICHAEL HARRISON,                       :
          Plaintiff,              :
                             :

          v.                       :          Civil No. 2:19-cv-02944-JMG
                             :
THEODORE HARRISON, _et al.,_             :
          Defendants.              :

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                      **July 15, 2021**

## I.    OVERVIEW

      Blood may be thicker than water, but when they enter the courtroom, family disputes often

take on the corrosive qualities of battery acid.  Plaintiff Michael Harrison contends that his father,

Dr. Theodore Harrison, actively conspired with his accountants to conceal a family Trust and

manipulate his tax returns as part of a nefarious plot to achieve illicit financial gain.  After

Defendant Harrison refused Plaintiff's demand for a distribution of one-third of the Trust principal,

Plaintiff initiated the instant case, asserting claims ranging from breach of fiduciary duty and fraud

to violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act.  The Defendants

in this case have each filed Motions for Summary Judgment seeking dismissal of Plaintiff's claims,

arguing that his allegations lack any degree of substantive proof.  Plaintiff has likewise filed

Motions for Partial Summary Judgment against each Defendant.  For the reasons set forth in greater

detail below, the Defendants' Motions are granted, and Plaintiff's Motions are denied.

## II.    FACTUAL BACKGROUND

### a.    Allegations

On April 29, 1995, Sol and Sydria Harrison created an irrevocable trust ("the Trust") for the sole benefit of their grandson, Plaintiff Michael Harrison.  Compl. ¶ 29.  Mr. and Mrs. Harrison designated their son and Plaintiff's father, Defendant Theodore Harrison, as Trustee.  Compl. ¶ 30. Funds from the Trust were held in an account at Janey Montgomery Scott ("JMS") from its inception through June 2017.  Def. Harrison SUF ¶ 42, ECF No. 101.  The terms of the Trust provide that, subject to the discretion of the Trustee, the net income and principal of the Trust should be used "for the support, maintenance, and education of our grandson."  Joint Appendix ("JA") 1314a, ECF No. 95.  In addition, the Trust instrument states that Plaintiff has the right to withdraw up to one-third of the Trust principal upon reaching the age of thirty, and to withdraw the full amount at the age of thirty-five.  *Id.* at 1315a.  These provisions notwithstanding, the Trustee is also authorized to withhold any such distributions if he determines that Plaintiff is unable to properly manage his affairs.  *Id.* at 1316a.

In addition to acting as Trustee, Defendant Harrison also filed Plaintiff's tax returns for him from the time Plaintiff turned eighteen in 2005 through 2017.  Compl. ¶ 15.  To this end, Defendant Harrison retained the accounting services of Defendants Michael Krassenstein and Ronald Unger, owners of Krassenstein & Unger, LLC (collectively "the Accountant Defendants"), an accounting firm based in Jenkintown, Pennsylvania.  Compl. ¶¶ 4-6, 16.  Following his graduation from college, Plaintiff also lived with Defendant Harrison at his home in New Hope, Pennsylvania from January 2013 through April 2015, and lived rent free in an apartment owned by Defendant Harrison in New York, New York from May 2015 through April 2016.  Def. Harrison SUF ¶¶ 26-27, 29. Plaintiff subsequently moved to Long Island to live with his girlfriend Sara Maniaci.  Compl. ¶ 30.

On December 28, 2016, Plaintiff purportedly discovered the existence of the Trust for the first time after asking Defendant Harrison about the sources of income reported on his 2013 tax returns.[1] *See* JA 1640a-1641a.  Plaintiff thereafter requested a copy of his 2013 tax return from Defendant Unger on December 30, 2016.  *Id.* at 1625a.  On January 11, 2017, Plaintiff sent an email to Defendant Harrison expressing his desire to handle his own taxes moving forward and requesting copies of his supporting tax documents dating back to 2005.  *See id.* at 1639a-1642a.  According to Plaintiff, he had the opportunity to review the entire Trust document with JMS financial advisor Norman Mielziner sometime in April 2017.  *Id.* at 160a, 130:2-5.  On June 11, 2017, Plaintiff confronted Defendant Harrison via email and accused him of wrongfully refusing to distribute the Trust principal, breaching his fiduciary duties, mishandling his taxes, and withholding tax information.  *Id.* at 1669a-1776a.  Plaintiff threatened to take legal action against Defendant Harrison if he did not distribute one-third of the Trust principal by July 7, 2017, Plaintiff's thirtieth birthday.  *Id.*

On July 8, 2019, Plaintiff filed suit against Defendant Harrison and the Accountant Defendants.  Plaintiff contends that Defendant Harrison and the Accountant Defendants acted in concert to defraud him by concealing the existence of the Trust, filing fraudulent tax returns with the IRS, opening accounts in Plaintiff's name without his knowledge or consent, laundering stolen funds, and fraudulently utilizing his social security number to obtain improper tax deductions.  Compl. ¶¶ 13-14, 38, 46.  Accordingly, the Complaint alleges violations of RICO (Count I), fraud (Count II), conspiracy to commit fraud (Count III), constructive fraud (Count IV), intentional infliction of emotional distress (Count V), breach of fiduciary duty (Counts VI & VII), gross negligence (Counts VIII & IX), and aiding and abetting breach of fiduciary duty (Counts X & XI).  Defendant Harrison

---

[1] Plaintiff was unemployed at the time.  Acct. Def. SUF ¶ 8, ECF No. 96.  Defendant Harrison had been filing Plaintiff's tax returns for him with his express permission since 2005.  *See infra* Section IV(d)(1).

and the Accountant Defendants each filed a Motion for Summary Judgment seeking dismissal of all counts on January 4, 2021.  That same day, Plaintiff filed a Motion for Partial Summary Judgment on his breach of fiduciary duty claims against Defendant Harrison and the Accountant Defendants, respectively.

### b. Procedural History

Plaintiff Michael Harrison filed a Complaint in this matter against Defendants Theodore Harrison, Ronald Unger, Michael Krassenstein, and Krassensten & Unger, LLC on July 8, 2019. *See* Compl., ECF No. 1.  On August 6, 2019, the Accountant Defendants filed a Motion to Dismiss. *See* ECF No. 8.  Defendant Harrison filed a Motion to Dismiss on December 6, 2019.  *See* ECF No. 18.  That same day, Judge Nitza I. Quiñones Alejandro denied the Accountant Defendants' Motion to Dismiss.[2]  ECF No. 19.  The Accountant Defendants then filed an Answer on December 20, 2019. *See* ECF No. 21.  On March 26, 2020, this Court denied Defendant Harrison's Motion to Dismiss. ECF No. 23.  Defendant Harrison subsequently filed an Answer on April 22, 2020.  *See* ECF No. 26.

On January 4, 2021, the Accountant Defendants and Defendant Harrison filed their respective Motions for Summary Judgment.  *See* ECF Nos. 96, 102.  Plaintiff also filed Motions for Partial Summary Judgment on his claims for breach of fiduciary duty against the Accountant Defendants and Defendant Harrison.  *See* ECF Nos. 99, 100.  On January 19, 2021, Plaintiff filed his Responses in Opposition to the Accountant Defendants' and Defendant Harrison's Motions.  *See* ECF Nos. 121, 122.  The Accountant Defendants and Defendant Harrison likewise filed their Responses in Opposition to Plaintiff's Motions that same day.  *See* ECF Nos. 125, 126.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[2] This case was reassigned from Judge Alejandro to this Court on March 3, 2020.  ECF No. 22.

Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). Likewise, a factual dispute is material if "it might affect the outcome of the suit under governing law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. However, the court must grant summary judgment where the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the moving party demonstrates the absence of any factual support for any of these essential elements, the non-movant must introduce specific facts necessitating resolution at trial. Fed. R. Civ. P. 56(e). The court must then examine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV. ANALYSIS

### a. Breach of Fiduciary Duty[3]

Plaintiff claims that Defendant Harrison breached his fiduciary duty as Trustee by failing to render an accounting for the Trust, withdrawing Trust funds and depositing them in his personal accounts, allowing the Trust to report income under Plaintiff's social security number, signing tax documents on Plaintiff's behalf without his consent, and refusing to make distributions to Plaintiff. *See* Pl. Mot. 12, ECF No. 99. Defendants assert that, since Plaintiff had knowledge of the facts underlying his claims well before the genesis of this case, his claims are time-barred under the

---

[3] Although Plaintiff's claims for breach of fiduciary duty are not the first counts listed in the Complaint, the issues encompassed therein are integral to the overall dispute between the Parties. Additionally, this issue features the only apparent grounds for consensus among the Parties i.e. the existence of fiduciary obligations on behalf of Defendant Harrison. The Court has therefore determined that these issues should be addressed first.

statute of limitations.  Def. Harrison Mot. 20; Acct Def. Mot. 25.  Furthermore, Defendant Harrison maintains that he acted in accordance with his duties as Trustee and utilized Trust funds to Plaintiff's benefit.  Def. Harrison Mot. 21.  The Accountant Defendants also argue that Plaintiff's claims must fail because he has not established the existence of a confidential relationship between himself and the Accountant Defendants.  Acct. Def. Mot. 25.

A party advancing a claim for breach of fiduciary duty must demonstrate (1) the existence of a fiduciary relationship; (2) that the defendant negligently or intentionally failed to act in good faith and solely for the plaintiff's benefit, and (3) that they suffered harmed as a result.  *Snyder v. Crusader Servicing Corp.*, 231 A.3d 20, 32 (Pa. Super. 2020).  The defendant may owe Plaintiff a fiduciary duty where they have the ability to exert undue influence over the plaintiff by virtue of a special, confidential relationship.  *See eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa. Super. 2002).  Claims for breach of fiduciary duty are subject to a two-year statute of limitations.  *Weis-Buy Services, Inc. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005).  In cases involving trust administration, the limitations period begins to run when the beneficiary knows, or should know, that the trustee has breached their fiduciary duty.  *Id.*

Plaintiff's claim for breach of fiduciary duty against Defendant Harrison is barred by the applicable statute of limitations.  According to Plaintiff, he concluded that Defendant Harrison had breached his fiduciary duty in April 2017.[4]  JA 167a, 138:4-8.  On June 11, 2017, Plaintiff sent an email to Defendant Harrison stating in relevant part:

> [U]ntil I at least receive what I am legally and ethically entitled to receive, on July 7, 2017, after this email, I will only be available to discuss, if necessary, which specific assets to liquidate in order for you to uphold your fiduciary duty and distribute to me, in accordance with the terms of the trust, 1/3 of the principal amount or $100,000.00 upon my turning the age of 30 on July 7, 2017.

---

[4] Specifically, Plaintiff testified that, "[w]hen I found out about the Trust in April 2017, that's when I determined, like, yeah, breach of fiduciary duty…the main one being…his failure with his duty to inform and report…he didn't give me any information…I literally needed to file a lawsuit simply to get the Trust document."  JA 168a, 138:4-24.

…

Donna's [Plaintiff's mother] claims for your and her wanton disregard for my health and welfare and your legal and ethical duty stems only 3 years back when I was at the age of 26. Why was I then not informed by you, the trustee when I, the beneficiary was the age of 18 about the trust created for my benefit? Why not 19? Why not 20? Why not 21? Why not 22? Why not 23? Why not 24? Why not 25? Both you and Donna have acknowledged to me and Sara [Plaintiff's girlfriend] that you are very well secure financially...Is perhaps the true reason you didn't tell me when I was 18, 19, 20, 21, 22, 24, 24, or 25 because you never actually had any intent on telling me about the trust created for my benefit, and in an attempt to gaslight and portray me as accountable for your egregious and intentional breach of fiduciary duty, have claimed nonsensical, completely unrelated justifications for not providing me with what you are legally and ethically obligated to provide me?

…

Donna informed both Sara and me if I sued you for what I am legally and ethically entitled to, I would not be seeing the big picture as I would subsequently be removed from your will and not have ownership of any of your properties, money, etc. I respectfully completely disagree and strongly encourage you to see the actual bigger picture as you only live once. First off, for Donna's threats to be viable, what she is attempting to leverage, which is your money, properties, etc. in this case, must be leverageable. Meaning, your present actions have unequivocally indicated a gross and malicious disregard for my person, my rights, and my autonomy, all while egregiously and unequivocally breaching your legal and ethical responsibility as trustee of the trust created for my benefit. If I can't even expect you to uphold, let alone not intentionally act in direct cross purpose of your legal and ethical duty to distribute to me money that isn't even yours, then why would I ever believe or expect that you would have me in your will to distribute to me your money, property, etc. where there is absolutely no legal responsibility for you to do so?

…

You, Ted Harrison are well aware and understand first hand my attention deficit disorder, which necessitated but was not limited to authorized extended time on examinations in order for me to succeed during school. The fact that you are fully aware of my disorder, yet consciously choose to intentionally breach your fiduciary duty with full knowledge your egregious breach is causing me a great deal of unnecessary wasted time and emotional strain is inflicting emotional distress.

…

In consideration of the aforementioned as well as your current and unequivocal and intentional breach of fiduciary duty, I have been advised no meeting with you can occur until I at least receive from you what the trust instructs you to distribute to me upon my turning the age of 30 this July 7, 2017, which is 1/3 of the principal amount of $100,000.00. As you are fully aware, however, it is within your discretion as the trustee to distribute to me what the trust instructs you to distribute to me prior to its mandated date. Since we are less than 4 weeks away until this mandated date arrives and in the interest of expediting

your alleged desire to have me in your life, it would be not only a constructive demonstration of good faith you have every intention of distributing to me this July 7, 2017 what the trust instructs you to distribute to me in less than 4 weeks…Unless you scheme on breaching your fiduciary duty this July 7, 2017, there is absolutely no reason why you shouldn't or wouldn't fulfill this basic request to make it not only comfortable for me to meet with you, but also possible for me to meet with you, especially considering how much you "love" me.

…

Since you personally have refused to give me an explanation as to why you are intentionally and egregiously breaching your fiduciary duty, I have no other way to make sense of your senseless mistreatment of me other than to believe you are projecting the hurt you feel in regards to the matter of your brother since I too am the older son, brother…At this time, the only item of discussion is whether you will be distributing to me what the trust instructs upon my turning the age of 30, which is 1/3 of the principal amount or $100,000.00 on July 7, 2017 or before hand [sic] at your discretion. I do not need to waste further time, energy and money traveling to Pennsylvania for something that could very simply be completed via email or over the phone as any reasonable fiduciary would agree…[I]f you continue to intentionally breach your fiduciary duty, I will have no choice but for you, the trustee to receive a demand letter from my attorney.

*Id.* at 1669a-1675a.

Plaintiff's email plainly shows that he was aware of the facts giving rise to Defendant Harrison's purported breach of fiduciary duty no later than June 11, 2017 (Plaintiff accuses Defendant Harrison of breaching his fiduciary at least six times). Therefore, the statutory period to file this claim expired no later than June 11, 2019. Having filed the Complaint on July 8, 2019, Plaintiff's claim for breach of fiduciary duty against Defendant Harrison is untimely under the statute of limitations.

Assuming that his claims were not statutorily barred, Plaintiff would still be unable to demonstrate the absence of a genuine factual dispute concerning Defendant Harrison's alleged breach of fiduciary duty. As evidenced by Plaintiff's email, the gravamen of Plaintiff's claim concerning Defendant Harrison's administration of the Trust appears to center on his refusal to distribute one-third of the Trust principal to Plaintiff. The Trust instrument imbues vast discretion upon the Trustee to determine if and when distributions are appropriate. According to that

document, Plaintiff has the right "upon attaining the age of 30…to withdraw up to one-third of the principal of his trust at any time or from time to time and the entire balance thereof at any time after attaining the age of 35." JA 1390a. This provision is subject to the condition that "[a]ny property distributable to a beneficiary who is under a disability may be retained by our Trustee." *Id.* at 1391a. The Trust document then explains that "a beneficiary shall be considered to be under a disability…at any time when such beneficiary shall in the opinion of our Trustee be unable by reason of illness or other condition to properly manage his or her affairs." *Id.*

Defendant Harrison purportedly elected to invoke the disability provision of the Trust document and delay distribution of the Trust principal in light of Plaintiff's "struggles with drug addiction and his ADHD, as well as his inability to manage money, [and] his illegal use of money to purchase drugs." *Id.* at 1874a. According to Defendant Harrison:

> [Plaintiff] is a drug addict. He has dealt drugs. He's refused to get a job. He has failed to manage his affairs. He has a condition. He has a disability which interferes with his ability to manage his affairs, and I did not want to see his funds dissipated…I was trying to save as much as I could…[W]e are hoping to put it in an annuity for Michael. Michael, again, would have wasted and dissipated everything. He hasn't a job…And this way, I would put it in an annuity. He could have funds when he is older. He has failed to use his younger years to be gainfully employed, and that's why I was hoping to, again, put the funds away for him and even supplement them for the future.

> *Id.* at 879a, 90:14-880a, 91:7.

Defendant Harrison asserts that Plaintiff has also been exposed to violent crime in relation to his drug use and dealing, including an incident where he was robbed at gun point during a drug deal. *Id.* at 1874a. Additionally, Defendant Harrison alleges that Plaintiff has "gone through tens of thousands of dollars in cash while living at home while having essentially no expenses." *Id.* Defendant Harrison has therefore concluded that Plaintiff is presently under a disability and unable to manage his own affairs. *Id.*

Plaintiff has offered little evidence to rebut Defendant Harrison's allegations concerning Plaintiff's disability aside from denying that he uses drugs or that he is under a disability. *See id.*

296a, 266:2-4; Pl. Mot. 9, ECF No. 99 (arguing that the Trustee is not entitled to withhold distributions upon his belief that Plaintiff will use the funds improperly).  As to Defendant Harrison's contention that Plaintiff is unable to manage his affairs, obtain gainful employment, or earn income from legitimate sources, Plaintiff's rebuttal amounts to an inconsistent, ever-developing narrative riddled with evasive responses and glaring contradictions.  Defendants have attempted numerous times to extract a modicum of evidence supporting these assertions and have been largely unsuccessful due to Plaintiff's unwillingness, or inability, to corroborate them.  As a result, the Court has found it essentially impossible to discern any genuine dispute of material fact as it relates to Defendant Harrison's exercise of discretion as Trustee to delay distribution of the Trust principal.

On July 15, 2020, Defendant Harrison filed a Motion to Compel Discovery against Plaintiff. *See* Def. Harrison Mot. to Compel, ECF No. 45.  Defendant Harrison had previously served Plaintiff with a Request for Production of Documents on May 26, 2020, seeking, among other things, documentation relating to Plaintiff's sources of income.  *Id.*, Ex. A at 6.  In response, Plaintiff represented to the Court that the requested documents had been produced on July 17, 2020. See ECF No. 47.  That same day, Plaintiff produced a Response to Defendant Harrison's First Set of Interrogatories.  *See* JA 1277a-1286a.  In his Response, Plaintiff stated that he was unemployed from 2013 through 2015.  *Id.* at 1297a.  Plaintiff also claimed that since 2016, he has earned income by walking dogs and managing the business operations of his health and wellness company and an interior design company, along with his girlfriend Sara Maniaci.  *Id.*

Plaintiff appeared for his first deposition on September 11, 2020.  *Id.* at 31a.  When asked whether he had located any of the materials related to his sources of income sought in the Request for Production, Plaintiff testified that he had not.  *Id.* at 44a, 14:10-19.  Defense counsel then asked Plaintiff what jobs he held in 2015 through 2016, to which Plaintiff replied that he had worked as a

bartender, although he could not recall how much money he had earned. *Id.* at 80a, 50:12-82a, 52:14. Plaintiff then testified that he also started a health and wellness business, and that he and Ms. Maniaci started their interior design company during that period. *Id.* at 82a, 52:16-20. However, as with his bartending job, Plaintiff stated that he did not recall how much he earned from these ventures, and that he had not reported any income from these jobs on his tax returns. *Id.* at 83a, 53:1-84a, 54:1. Plaintiff later changed his testimony to state that he believed that he earned between $25,000 and $50,000 between 2015 and 2016, and that he had records of client payments for his health and wellness business. *Id.* at 85a, 55:17-23; 88a, 58:13-90a, 60:13.

In further response to Defendant Harrison's claim that Plaintiff was incapable of financial self-sufficiency, Plaintiff testified that his interior design company, Sara Maniaci Interiors, had articles of incorporation in New York and that he and Ms. Maniaci had a contract establishing his fifty percent ownership interest in the company. *Id.* at 91a, 61:6-92a, 62:23. Plaintiff then stated that he earned about the same amount of income in the years 2017 and 2018, but that the interior design company earned $100,000 in 2018, $200,000 in 2019, and $500,000 in 2020. *Id.* at 98a, 68:9-99a, 69:2; 100a, 70:9-101a, 71:8. According to Plaintiff, he and Ms. Maniaci only took a one-dollar salary from this revenue while reinvesting the rest back into the company. *Id.* at 102a, 72:21-24. Plaintiff then explained that they also utilized this business revenue to cover their living expenses since their apartment served as the physical location of their office. *Id.* at 105a, 75:8-107a, 77:1.

On October 1, 2020, Plaintiff participated in a second deposition. *See* ECF No. 84-2. At that time, Plaintiff had still not produced the requested documents concerning his earnings during the relevant period. *Id.* at 340:19-341354:4. When asked what documents Plaintiff had in his possession reflecting his wages since 2012, Plaintiff testified that he had "income statements from invoices that I've done with my company and invoice stuff that I've done with Sara's and mine

interior design company." *Id.* at 354:3-10. Plaintiff then testified at a third deposition on October 26, 2020. *See* ECF No. 107-5. During this deposition, Plaintiff changed his testimony to state that he was a forty percent owner of Sara Maniaci Interiors, and that his previous testimony that he was a fifty percent owner was incorrect. *Id.* at 728:4-729:10. When asked whether he was chief financial officer of Sara Maniaci Interiors, Plaintiff responded, "I mean, if you want to put a label on it. I do multiple things besides just certain financial obligations." *Id.* Plaintiff then stated that he would not produce copies of the company's business records because Ms. Maniaci owned them. *Id.* at 737:8-19. Additionally, Plaintiff testified that Ms. Maniaci had possession of the agreement reflecting his ownership interest in the company and that he would ask her for a copy. *Id.* at 755:10-19.

After still receiving no records from Plaintiff concerning his sources of income, Defendant Harrison filed a Second Motion to Compel Discovery on October 30, 2020. *See* ECF No. 65. On November 4, 2020, Defendant Harrison filed a Notice of Intent to Serve Subpoenas on various third Parties, including Ms. Maniaci. *See* ECF No. 80. In response, Plaintiff stated that he had complied with Defendant Harrison's Request for Production and filed a Motion to Quash Defendant Harrison's subpoenas. *See* ECF Nos. 77, 80. In order to resolve these outstanding disputes, the Court held a discovery conference on November 12, 2020. *See* ECF No. 83. Upon consideration of the extensive arguments offered by the Parties, the Court granted Defendant Harrison's Motion to Compel and granted in part Plaintiff's Motion to Quash. *See* ECF No. 82. The Court held that Defendant Harrison's requests sought relevant information concerning Plaintiff's sources of income, but that the "records of any personal accounts of Sara Maniaci that are unrelated to her shared business with Plaintiff" were not relevant. *Id.*

On January 11, 2021, Defendant Harrison filed a Third Motion to Compel Discovery, stating that Plaintiff still had not cured his discovery deficiencies. *See* ECF No. 107. The Court

issued an Order the following day directing the Parties to "provide a written, item-by-item certification to the Court attesting to full compliance with the Court's November 12, 2020 Order." *See* ECF No. 109. The Order further stated that "[e]ach certification must specifically state that the Party has produced, in full, each document (or set of documents) subject to the Parties' respective requests for production…or state that such documents do not exist." *Id.* On January 15, 2021, Plaintiff submitted an affidavit to the Court stating that:

> Sara Maniaci Interiors is currently, and has always been, a sole proprietorship owned 100% by Sara Maniaci. Michael Harrison does not legally own any percentage in this Company. Michael Harrison's earlier testimony regarding his ownership interest was incorrect and a misunderstanding…As testified, Michael Harrison has no unilateral authority in any capacity related to Sara Maniaci Interiors without expressed [sic] authorization from Sara Maniaci…Sara Maniaci holds, and has always maintained, sole and absolute ownership and authority over Sara Maniaci Interiors.

> ECF No. 116.

Defendant Harrison subsequently filed a Motion to Dismiss, arguing that Plaintiff testified falsely under oath and that punitive dismissal was appropriate. *See* ECF No. 117. On January 25, 2021, Plaintiff filed a Response stating that Plaintiff's "misstatements" and "misunderstanding of corporate law" resulted from his belief that he had a written agreement with Ms. Maniaci regarding the business, and that Plaintiff had since learned that none exists. *See* ECF No. 129.

On January 26, 2021, during cross examination in a related state matter before the Bucks County Court of Common Pleas, Plaintiff reasserted that his previous testimony regarding his ownership interest in Sara Maniaci Interiors was a "misstatement" and a "misunderstanding." *See* ECF No. 152, 16:2-12. When asked what written documents he had establishing his ownership interest, Plaintiff replied, "I misunderstood." *Id.* at 16:14-18. Plaintiff then stated, "I misunderstood our fifty percent rent contract that we worked out between us over this. It is that simple. I'm very emotionally invested in helping Sara succeed." *Id.* at 23:12-14. Defense counsel then sought to clarify whether Plaintiff had confused an apartment lease agreement with an interior

design business ownership agreement, and Plaintiff replied, "No. There was a misunderstanding. It was that simple. I don't confuse a rent agreement with the ownership of a business agreement." *Id.* at 23:20-25. When pressed to clarify what the misunderstanding was, Plaintiff replied, "[f]or the misunderstanding, you would have to be privy to the conversations between Sara and me, which you were not." *Id.* at 24:1-7. Plaintiff then testified that he did not participate in creating the purported rent agreement, stating that, "[i]t would have been a simple signature between me and someone who is my girlfriend…That was my misunderstanding at the time." *Id.* at 28:6-16.

Defense counsel then asked Plaintiff what gave him the impression that the supposed rent agreement between Ms. Maniaci and himself gave him an ownership interest in her company, to which Plaintiff replied, "I don't recall." *Id.* at 29:1-5. Seeking to clarify Plaintiff's position, Defense counsel asked, "So you have a finance background, you're thirty-three years old, you signed a lease agreement believing it is a fifty percent ownership agreement of a business in New York City, is that correct?" *Id.* at 30:19-25. Plaintiff replied, "No, that is not right…Again, I told you this was a misunderstanding." *Id.* Throughout the rest of the hearing, Plaintiff continued to repeat that he could not recall what made him think that he had an ownership interest in Sara Maniaci Interiors and that his prior testimony had been "a misunderstanding." *See, e.g.*, *id.* at 31:14-18; 33:7-16. Plaintiff also testified that he was paid in cash for his dog walking and health and wellness businesses, and that he had no supporting documents to substantiate his claims regarding his sources of income. *Id.* at 37:16-39:4; 41:10-42:8. Finally, when asked whether it was his testimony that he waited to request a copy of the business ownership agreement from Ms. Maniaci until after he sat for three sworn depositions and was served with three subpoenas, Plaintiff responded, "Correct." *Id.* at 43:22-44:3.

On February 2, 2020, Sara Maniaci appeared for a deposition in this matter. *See* ECF No. 151. During her deposition, Ms. Maniaci testified that Plaintiff never told her that he had been

subpoenaed for records relating to his sources of income nor did he ask for her help looking for them. *Id.* at 21:9-14. Ms. Maniaci further testified that Plaintiff has never had an ownership interest in Sara Maniaci Interiors and that there was never an ownership agreement between them. *Id.* at 25:18-27:24. Additionally, despite Plaintiff's testimony that Sara Maniaci Interiors was a source of income for him in 2016, and that the company generated $100,000 in revenue in 2018, Ms. Maniaci testified that she started the company in November 2019. *Id.* at 39:10-12. Ms. Maniaci also testified that the business did not generate $500,000 in revenue in 2020 and that Sara Maniaci Interiors does not have articles of incorporation. *Id.* at 32:2-33:17; 39:13-16.

Defense counsel then asked Ms. Maniaci about the misunderstanding concerning the rent agreement between her and Plaintiff, to which Ms. Maniaci responded:

> I can't speak exactly to what he said in the deposition. I guess I would say ask Michael exactly what the misunderstanding was in reference to…I vaguely recall…[b]eing in agreement about the apartment. I think we might have written something down, but I'm not sure and I haven't seen it since.

*Id.* at 37:5-23.

When asked whether she knew if a written lease agreement actually existed, Ms. Maniaci testified that she did not know, but if it did, Plaintiff would have written it. *Id.* at 44:8-19. Defendant Harrison brought the foregoing testimony to the Court's attention during a phone conference with the Parties on March 4, 2021. *See* ECF No. 132. The Court subsequently ordered an evidentiary hearing on April 19, 2021 to afford Plaintiff an opportunity to clarify the multiple substantive discrepancies in his testimony regarding his sources of income. *See* ECF No. 137. During the hearing, Plaintiff again repeatedly asserted that his prior testimony was "a misunderstanding" without offering any further elaboration. Given Plaintiff's confidence and level of specificity in repeatedly testifying about his business accomplishments, the Court finds that Plaintiff's explanation that these untruths were the result of some amorphous "misunderstanding" to be both implausible and entirely without foundation. Moreover, Plaintiff's hostile, evasive, and

inconsistent testimony would leave any reasonable factfinder with virtually no basis for perceiving a coherent rebuttal to Defendant Harrison's claim that Plaintiff could not manage his financial affairs.

The Court finds that Plaintiff's claim that Defendant Harrison breached his fiduciary duty by withholding distributions of the Trust principal lacks evidentiary support. Pursuant to the plain terms of the Trust instrument, Defendant Harrison determined that Plaintiff is unable to manage his financial affairs based on, among other things, his inability obtain gainful employment or earn legitimate income. To rebut these claims, Plaintiff has testified under oath that he derives income from a variety of jobs. However, Plaintiff produced no supporting evidence despite having offered sworn testimony attesting to its existence and his possession thereof. The Court has repeatedly ordered Plaintiff to provide this documentation to no avail.

Since these discovery requests pertaining to material facts remain outstanding, the Court is justified in denying Plaintiff's Motion for Partial Summary Judgment against Defendant Harrison. *See Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015). Additionally, Plaintiff has offered sworn affidavits which directly contradict his testimony in three prior depositions and has provided no satisfactory explanation for these discrepancies. The Court will therefore exercise its discretion in disregarding these representations as entirely unsupported by the record. *Daubert v. NRA Group, LLC*, 861 F.3d 382, 391-92 (3d Cir. 2017). As a result, the only remaining evidence Plaintiff has offered to rebut Defendant Harrison's claims is a string of perplexing and contradictory statements which no factfinder could untangle in Plaintiff's favor. The Court has found it impossible to decipher Plaintiff's preposterous excuses for his inconsistent testimony. There is little, if any, evidentiary basis upon which the Court, or a reasonable jury, could discern a genuine factual dispute concerning Defendant Harrison's exercise of discretion in withholding distributions of the Trust principal from Plaintiff.

Plaintiff's remaining claims against Defendant Harrison are equally unavailing.[5] According to Plaintiff, Defendant Harrison and the Accountant Defendants improperly reported Trust income under the Plaintiff's social security number rather than an Employer Identification Number (EIN). Pl. Mot. 8, ECF No. 99; Pl. Mot. 5-6, ECF No. 100. Defendant Harrison testified that his parents' initial trust attorney set up the Trust under Plaintiff's social security number and that he had no reason to suspect that this was improper. JA 900a, 111:19-901a,112:7. Plaintiff contends that "IRS regulations require an irrevocable trust to apply for and use an EIN for all operations of a trust and the filing of an annual tax return for the trust on IRS Form 1041." Pl. Mot. 8, ECF No. 99. In support of this claim, Plaintiff provides a link to a nonexistent web page. *Id.*, Ex. I at 3 n.10.

Defendant Harrison responds that, as a "grantor trust," the Trust was properly reported under Plaintiff's social security number. Def. Harrison Resp. 15. When the trust instrument treats the grantor, or another person, as the owner of the trust by affording them substantial dominion and control over the trust income, that income should be taxed to the grantor or beneficiary to whom the income may be distributed. *See* 26 U.S.C. § 671; 26 C.F.R. § 1.671-2(a), (b). A trustee reporting income in these circumstances must "furnish the name and taxpayer identification number (TIN) of the grantor or person treated as the owner of the trust." 26 C.F.R. § 1671-4(b)(2)(i)(A). The Trust instrument in the instant case provides that:

> The net income shall, in the discretion of our Trustee either be accumulated, in whole or in part, and added to principal at the end of the accounting period or paid in such amounts as our Trustee may deem appropriate for the health, support, maintenance and education of our grandson.

> Our Trustee in his discretion may from time to time make payments from principal in such amounts as he deems appropriate for Michael's health, support, maintenance, and education, up to the entire principal amount.

---

[5] Plaintiff asserts that Defendant Harrison also breached his fiduciary duty by attempting to transfer the Trust principal to his own personal accounts and filing Plaintiff's taxes without his consent. Pl. Mot. 6-8, ECF No. 99. As discussed *infra* Section IV(d)(i), these claims lack evidentiary support.

> Michael, upon attaining the age of 30, shall have the right to withdraw up to one-third of the principal of *his* trust at any time or from time to time and the entire balance thereof at any time after attaining the age of 35 (the maximum amount subject to withdrawal before our grandson attains the age of 35 to be based upon the market value of the principal at the time of his first request for principal hereunder).

JA 1359a (emphasis added).

These terms require the Trust principal to be used entirely for Plaintiff's support, subject to the discretion of Defendant Harrison. Plaintiff is also entitled to withdraw certain portions of the Trust principal at designated times, as Defendant Harrison deems appropriate. The Trust instrument thus treats Plaintiff as the owner of the Trust, affording him substantial dominion and control over the Trust income, and rendering it proper to report the income under Plaintiff's social security number.

Plaintiff also alleges that Defendant Harrison breached his fiduciary duty by failing to account for the Trust property. Pl. Mot. 7, ECF No. 99. Based on Defendant Harrison's testimony that he did not keep a record of Trust expenses aside from receipts, checks, and credit card statements, Plaintiff reasons that Defendant Harrison does not have the documents necessary to prepare a full accounting of the Trust. *Id.* at 7. Plaintiff asserts that without the ability to render an accounting, it is impossible to show how much, or for what purpose, Defendant Harrison withdrew money from the Trust. *See id.* This argument is flawed because Plaintiff does not explain what records Defendant Harrison was obligated to retain beyond receipts, checks, and credit card statements. The fact that Defendant Harrison has provided an expense schedule and tax returns reflecting the amounts and purpose of his withdrawals from the Trust also tends to undermine Plaintiff's claim. *See infra* Section IV(d)(i). In a similar vein, Plaintiff has offered no proof of any resulting harm from this purported failure to account.

Plaintiff further alleges that the Accountant Defendants breached their fiduciary duties by failing to advise Defendant Harrison of the need to obtain an EIN for reporting his Trust income, filing Plaintiff's taxes without proper authorization, and by failing to maintain records relating to

his tax filings.  Pl. Mot. 5-8, ECF No. 100.  However, Plaintiff has not established any fiduciary duty on behalf of the Accountant Defendants.  Pennsylvania law provides that a professional owes a fiduciary duty to their client only where the relationship is confidential as a matter of law.  *Tekman v. Berkowitz*, 639 F. App'x 801, 806 (3d Cir. 2016).  A confidential relationship may be found where there is "such a disparity in position that the inferior party places complete trust in the superior party's advice…so as to give rise to an abuse of power."  *Id.* (quoting *eToll*, 811 A.2d at 21-23).  The relationship between an accountant and their client is not *per se* confidential, and the fiduciary status of a tax accountant is a fact-intensive inquiry.  *Id.*

The record evidence does not establish a confidential relationship between Plaintiff and the Accountant Defendants.  Plaintiff relied on his father to convey his tax information to the Accountant Defendants in order to prepare his tax returns.  There is no evidence to suggest that the Accountant Defendants provided Plaintiff with advice concerning tax strategy, that Plaintiff paid them for their services, or that they had unfettered discretion to prepare his taxes.  In fact, the record shows that Plaintiff repeatedly provided written authorization to the Accountant Defendants before they filed his tax returns (which also refutes his claim that they filed his taxes without his consent).  *See, e.g.*, 1437a; 1538a-1539a; 1666a-1667a.  Plaintiff provides no explanation as to how his attenuated relationship with the Accountant Defendants gave rise to an exploitable disparity in knowledge, especially given that he holds a degree in finance.  The Court can discern nothing more than an arms-length commercial transaction between the Parties, which is facially insufficient to trigger fiduciary obligations on behalf of the Accountant Defendants.  *Tekman*, 639 F. App'x at 806.

### b.  Aiding and Abetting Breach of Fiduciary Duty

Under Pennsylvania law, a claim for aiding and abetting breach of fiduciary duty requires evidence of (1) a breach of fiduciary duty; (2) the defendant's knowledge of that breach; and (3)

that the defendant provided substantial assistance or encouragement in effecting that breach. *Dille v. Geer*, No. 20-924, 2020 WL 7624835, at *20 (E.D. Pa. Dec. 22, 2020). Either the defendant's direct knowledge of, or willful ignorance to, the breach of fiduciary duty may satisfy the knowledge requirement for aiding and abetting. *Env. Equip. & Serv. Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705, 727 (E.D. Pa. 2010). Having concluded that dismissal is appropriate as to Plaintiff's underlying claims for breach of fiduciary duty, the Court finds that Plaintiff cannot satisfy the first requisite element of his claims for aiding and abetting.[6] These claims are therefore dismissed.

### c. Racketeer Influenced and Corrupt Organizations (RICO) Act

Plaintiff alleges that Defendant Harrison and the Accountant Defendants operated as an associated-in-fact enterprise for the purpose of defrauding the IRS and Plaintiff in violation of 18 U.S.C. § 1962(c). Compl. ¶¶ 51-56; Pl. Resp. to Acct. Def. Mot. 6-7. According to Plaintiff, Defendants engaged in a pattern of racketeering activity which included obtaining improper tax deductions at Plaintiff's expense, withholding Plaintiff's supporting tax documentation, and concealing the existence of the Trust by reporting Trust income on Plaintiff's tax returns. Pl. Resp. to Acct. Def. Mot. 5-7; Pl. Resp. to Def. Harrison Mot. 7-8. Defendants counter that Plaintiff's claim fails to establish the requisite elements of a distinct RICO enterprise which is separate and apart from the underlying pattern of alleged racketeering activity. Acct. Def. Mot. 5-6; Def. Harrison Mot. 6-10. Furthermore, Defendants aver that Plaintiff has provided no evidence of "conduct" or "pattern of racketeering activity" as contemplated under the RICO statute. Acct. Def. Mot. 6-7. Defendant Harrison also contends that Plaintiff has failed to show that he suffered actual damages as a direct result of Defendants' purported racketeering activity. Def. Harrison. Mot. 12.

---

[6] Furthermore, Pennsylvania courts generally recognize that aiding and abetting claims are subject to a two-year statute of limitations. *Env. Equip. & Serv. Co.*, 741 F. Supp. 2d at 727.

To maintain a cause of action for a violation of RICO, the plaintiff must prove (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated in the conduct or affairs of the enterprise; and (4) that the enterprise engaged in a pattern of racketeering activity. *Jaye v. Oak Knoll Village Condominium Owners Assoc., Inc.*, 751 F. App'x 293, 297 (3d Cir. 2018); *Andela v. American Ass'n for Cancer Research*, 389 F. App'x 137, 142 n.6 (3d Cir. 2010). An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." 18 U.S.C. § 1961(4). A pattern of racketeering activity requires at least two predicate acts of racketeering within a ten-year period. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 363 (3d Cir. 2010) (citing 18 U.S.C. § 1961(5)). Predicate acts of racketeering include, *inter alia*, mail fraud and wire fraud. 18 U.S.C. § 1961(1). "Proving a pattern of racketeering activity requires the plaintiff to show 'that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'" *Germinaro v. Fidelity Nat'l Title Ins. Co.*, 737 F. App'x 96, 102 (3d Cir. 2018) (quoting *United States v. Bergrin*, 650 F.3d 257, 267 (3d Cir. 2011)). In addition to the aforementioned elements, the plaintiff must also demonstrate injury to their business or property proximately caused by the defendant's violation of the RICO statute. *Maio v. Aetna, Inc.*, 221 F.3d 472, 482-83 (3d Cir. 2000).

The Court finds that Plaintiff has not established that Defendants maintained an associated-in-fact enterprise, that they engaged in an ongoing pattern of racketeering activity, or that Plaintiff sustained harm as a result of Defendants' alleged racketeering activity. Plaintiff has offered no evidence showing that Defendants associated for any purpose other than the tax preparation services which Plaintiff alleges constituted Defendant's fraudulent scheme. Likewise, Plaintiff has offered insufficient evidence of the Accountant Defendants' participation in the affairs of any purported enterprise. The Court also finds that Plaintiff has failed to rebut Defendant Harrison's evidence that

his withdrawals from the Trust were for Plaintiff's benefit and that his other claims for economic harm are contingent on future events. Plaintiff's claims fail to raise a genuine dispute of material fact and are subject to dismissal.

### i. RICO Enterprise

A RICO enterprise (1) is an ongoing organization with a decision-making framework; (2) functions as a continuing unit; and (3) is distinct from the pattern of racketeering activity in which it engages. *U.S. v. Urban*, 404 F.3d 754, 770 (3d Cir. 2005). "The existence of an 'enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other.'" *Bryant v. Collins*, No. 15-00302, 2017 WL 1354941, at *5 (E.D. Pa. Apr. 13, 2017) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 367). The organization must therefore maintain operations beyond that which is necessary to commit the predicate racketeering offenses. *U.S. v. Console*, 13 F.3d 641, 651-52 (3d Cir. 1993). Where an organization has no distinct structure for directing or controlling its affairs beyond the pattern of illegal activity alleged, there is no enterprise for the purposes of RICO. *Deckard v. Emory*, No. 17-5182, 2020 WL 3960421, at *10 (E.D. Pa. July 13, 2020).

Plaintiff asserts that Defendant Harrison and the Accountant Defendants "acted together to maintain control over Plaintiff and his tax and financial information, including…Defendants' refusal pre-litigation to provide Plaintiff with any of the supporting tax documents Defendants used to prepare and file Plaintiff's taxes." Pl. Resp. to Acct. Def. Mot. 6. Additionally, Plaintiff contends that "Defendants worked together and conspired to hide the Trust from Plaintiff for his entire lifetime, [and] report Trust income on Plaintiff's personal tax returns…thereby not only decreasing the tax burden owed to the IRS in furtherance of their scheme, but also shielding the Trust from the IRS's radar." *Id.* at 7. In response, Defendants argue that Plaintiff has offered no evidence of a relationship between Defendant Harrison and the Accountant Defendants that is

distinct and apart from the alleged wrongdoing associated with the preparation of the Harrison's taxes. *See* Acct. Def. Mot. 5; Def. Harrison Mot. 8-10.

The Accountant Defendants are licensed CPAs that Defendant Harrison engaged to prepare Plaintiff's federal and state income tax returns from 2005 until 2017. Compl. ¶¶ 17-18. Defendant Krassenstein testifies that, during the relevant period, he communicated with Defendant Harrison approximately once per year. JA 1121a, 19:5-14. As to Defendant Unger, he corresponded with Defendant Harrison primarily over email. *Id.* at 1013a, 21:14-15. In these communications, Defendant Harrison provided financial records to the Accountant Defendants which they then used to prepare Plaintiff's taxes. *See, e.g.*, *id.* at 1472a-1487a; 1504a-1519a; 1544a-1561a. Likewise, the Accountant Defendants would email Defendant Harrison the requisite forms necessary to finalize Plaintiff's tax returns, which Defendant Harrison had Plaintiff sign before sending the completed forms back to the Accountant Defendants. *See, e.g.*, *id.* at 1501a-1503a; 1540a-1543a.

Plaintiff's allegations of illicit activity between Defendant Harrison and the Accountant Defendants pertain exclusively to their preparation of the Harrison's tax returns. The evidence offered by Plaintiff merely confirms that Defendant Harrison engaged the services of the Accountant Defendants for this purpose. For example, in support of his contention that Defendants conspired to withhold supporting tax documents from him, Plaintiff cites an email from Defendant Krassenstein informing Plaintiff that his original supporting tax information had been returned to Defendant Harrison. *See* Pl. Resp. to Acct. Def. Mot. 6 (citing Pl. Resp. to Acct. Def. Mot. to Dismiss, Ex. A, ECF No. 9). Notwithstanding the fact that this email exchange occurred on March 22, 2018 (approximately eight months after Plaintiff filed the Complaint in this matter), this document merely shows that the Accountant Defendants prepared Plaintiff's taxes. Plaintiff also cites a document showing the various dates that his tax returns were filed from 2012 through 2016. *Id.* (citing Pl. Resp. to Acct. Def. Mot. to Compel, Ex. A, ECF No. 91). Not only does this evidence fail to indicate

any wrongdoing by Defendants, it once again merely demonstrates a relationship predicated on filing the Harrison's tax returns.

As to Plaintiff's allegations that Defendants defrauded Plaintiff and the IRS to obtain improper tax deductions and hide the Trust from him,[7] Plaintiff points to evidence which in no way corroborates these claims. *See id.* (citing the deposition testimony of Defendant Harrison stating that he used funds from the Trust to pay for Plaintiff's expenses). Plaintiff's attempt to substantiate these assertions amounts to nothing more than conclusory statements and random references to evidence that is not remotely incriminating. Even the most attenuated strain of inferential reasoning would not permit a finding that Defendants maintained an enterprise separate and apart from their alleged misconduct pertaining to Plaintiff's tax returns. Therefore, Plaintiff has failed to satisfy the "enterprise" element of his RICO claim.

### ii. Enterprise Conduct and Pattern of Racketeering Activity

A pattern of racketeering activity requires at least two related predicate acts of racketeering within a ten-year period. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 363. Predicate acts of racketeering include mail fraud and wire fraud. 18 U.S.C. § 1961(1). RICO claims predicated on mail or wire fraud are subject to particularized scrutiny due to the relative ease of alleging a pattern of activity which, on its face, appears to satisfy these elements, but ultimately does not. *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010). Mail fraud or wire fraud consists of (1) knowing and willful participation in a scheme to defraud; (2) use of the mail or interstate wires in furtherance of that scheme; and (3) fraudulent intent. *O'Keefe v. Ace Restaurant Supply, LLC*, No. 11-1330, 2019 WL 952282, at *9 (E.D. Pa. Feb. 27, 2019). The term "defraud"

---

[7] One of the core structural features of an associated-in-fact enterprise is a common interest among the associated members. *Boyle v. U.S.*, 556 U.S. 938, 946 (2009). Plaintiff has offered no explanation or evidence as to what interest the Accountant Defendants would have in withholding Plaintiff's tax documents, hiding the Trust from him, or fraudulently obtaining a tax deduction for Defendant Harrison at Plaintiff's expense.

commonly refers to a "deprivation of something of value by trick, deceit, chicane, or overreaching." *Germinaro*, 737 F. App'x at 104-05. Predicate acts are related if the evidence establishes "that the criminal activities have the same or similar purposes, results, participants, victims, or methods of commission, or are interrelated by distinguishing characteristics and are not isolated events." *Id.* (quoting *U.S. v. Bergin*, 650 F.3d 257, 267 (3d Cir. 2011)).

To support a finding that a party engaged in the conduct of an enterprise, the plaintiff must demonstrate "participat[ion] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). The party must have "knowingly engaged in 'directing the enterprise's affairs' through a pattern of racketeering activity." *Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (quoting *Reves*, 507 U.S. at 179). Providing goods or services that ultimately benefit the enterprise does not automatically render that party liable under the RICO statute. *Id.* Accordingly, the mere provision of generic financial services, even if found to be deficient, does not alone evidence participation in the affairs of the enterprise. *Id.* at 1539-40.

Plaintiff alleges that Defendants, "since as early as 1995, acted together to defraud the IRS and Plaintiff…[and] to lower the tax burden of the Trust by reporting Trust income on Plaintiff's tax returns for their personal gain." Pl. Resp. to Acct. Def. Mot. 8; Pl. Resp. to Def. Harrison Mot. 10. The Accountant Defendants counter that Plaintiff has failed to offer proof of their participation in, or management of, the enterprise itself. *Id.* (citing *Grider v. Keystone Health Plan Cent., Inc.*, No. 2001-05641, 2003 WL 22182905, at *25 (E.D. Pa. Sept. 18, 2003)). They reason that preparing Defendant Harrison's and Plaintiff's tax returns, even erroneously, does not evidence conduct within a RICO enterprise in furtherance of a pattern of racketeering activity. *Id.* 6-7. As such, the Accountant Defendants argue that Plaintiff cannot show that they participated in the conduct or affairs of the alleged RICO enterprise.

Plaintiff's allegations concerning the Accountant Defendants are singularly directed toward their provision of accounting services to Defendant Harrison. The evidence offered in support of Plaintiff's claims against Defendant Harrison likewise implicates no joint undertaking with the Accountant Defendants separate and apart from tax preparation. As with a lawyer who may provide indispensable legal advice in the course of preparing a client's tax returns, performance of CPA services does not *ipso facto* demonstrate participation in the operation or management of a RICO enterprise. *Peat, Marwick, Main & Co.*, 996 F.2d at 1539. Without more, Plaintiff's claims are facially deficient.

### iii. Injury to Business or Property

Any party who sustains economic harm from another party's violation of the RICO statute may recover treble damages and the cost of bringing suit, including reasonable attorney's fees. *See* 18 U.S.C. § 1964(c). The party seeking damages must demonstrate (1) injury to their business or property and (2) that the injury was proximately caused by defendant's racketeering activities. *Baeler v. Mut. Fire, Marine and Inlands Ins. Co.*, 242 F. App'x 802, 805 (3d Cir. 2007). Allegations and proof of actual monetary loss generally constitute an injury to business or property. *See Maio*, 221 F.3d at 483. Conversely, the assertion that damages might arise in the future as a result of a defendant's conduct is speculative and thus inadequate to establish tangible economic harm. *See In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633, 639-40 (3d Cir. 2015) (citing *Maio,* 221 F.3d at 495). A plaintiff who fails to make a threshold showing of RICO damages lacks standing to raise a RICO claim. *Baer*, 242 F. App'x at 805.

Plaintiff asserts that he suffered "substantial damages" for which the Accountant Defendants are liable pursuant to RICO. Pl. Resp. to Acct. Def. Mot. 16. According to Plaintiff,

[T]he failure of the Accountant Defendants to inquire into (or their active concealment of) income from the Trust being reported using Plaintiff's social security number directly contributed to Plaintiff's inability to uncover the Trust and Dr. Harrison's withdrawals from

the trust, resulting in direct damages of at least $75,000, and consequential damages of a much greater amount.

> *Id.*

This assertion is problematic because, as discussed *infra* Section IV(d)(i), the record evidence suggests that Dr. Harrison made withdrawals from the Trust pursuant to his authority to reimburse himself for expenditures made in support of Plaintiff's healthcare and education. These withdrawals appear to have been to Plaintiff's economic benefit, not to his harm. Plaintiff also alleges that "the improper filing of the Trust and Plaintiff's taxes now imposes the financial burden on Plaintiff to amend prior years' returns and therefore face significant back taxes, interest, fees, etc. from the IRS and the various state taxing authorities." *Id.* at 16-17. These claims are wholly contingent on future events and thus do not constitute tangible economic harm. Plaintiff is therefore unable to establish that he suffered harm to his business or property as a result of Defendants' violation of RICO.

### d. Fraud, Conspiracy to Commit Fraud, and Constructive Fraud

Plaintiff alleges that Defendant Harrison and the Accountant Defendants conspired to defraud him by filing false tax returns with the IRS without his consent, fraudulently utilizing his identity to launder money through various financial accounts, concealing the existence of the Trust, making improper withdrawals from the Trust, and misappropriating funds from Plaintiff's savings bonds. *See* Compl. ¶¶ 13-14, 21, 27, 31, 36-37, 39, 41, 43, 47, 58-70; Pl. Resp. to Def. Harrison Mot. 13-15; Pl. Resp. to Acct. Def. Mot. 10-13. In furtherance of this purported scheme, Plaintiff contends that Defendant Harrison and the Accountant Defendants conspired to misrepresent and conceal material facts with the intent of inducing Plaintiff's reliance on their good faith efforts to handle his finances. *See* Compl. ¶¶ 62-63, 69. Additionally, Plaintiff claims that Defendant Harrison engaged in constructive fraud by committing these acts despite the fiduciary duties he owed to Plaintiff. Compl. ¶¶ 71-81. For the reasons set forth in more detail below, the Court finds

that each of Plaintiff's allegations underlying these claims are either barred by the applicable statute of limitations or entirely unsupported and, at times, directly controverted by the record evidence.

### i. Fraud

To sustain a cause of action for fraud, the moving party must demonstrate (1) that the defendant made a representation; (2) which was material to the transaction at hand; (3) with knowledge or with reckless disregard for its falsity; (4) with the intent to mislead; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by said reliance. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018). Fraudulent activity includes "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Funk v. Bradley*, No. 1771 MDA 2019, 2020 WL 3058032, at *4 (Pa. Super. June 8, 2020) (quoting *Kit v. Mitchell*, 771 A.2d 814, 819 (Pa. Super. 2001)). Plaintiffs asserting a claim for fraud must do so with particularity and corroborate their allegations with specific facts, not mere innuendo. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1072 (Pa. Super. 2003). In cases involving allegations of fraudulent concealment, the plaintiff has the burden of proving their claims "by clear, precise, and convincing evidence." *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005).

Defendant Harrison and the Accountant Defendants argue that Plaintiff's claims are barred by the applicable two-year statute of limitations. Def. Harrison Mot. 14; Acct. Def. Mot. 10-12. Plaintiff filed a Complaint in this matter on July 8, 2019. *See* Compl. Therefore, Defendants reason, the statute of limitations began to run on Plaintiff's claims on July 8, 2017. *See, e.g.*, Acct. Def. Mot. 12. Defendants contend that since Plaintiff had knowledge of the facts necessary to put him on notice of a potential cause of action well before this date, his claims fall outside of the statutory limitations period. *See id.* Plaintiff counters that his claims are timely because he was unable to

discover any of Defendants' misconduct due to their collective concealment of material information. Pl. Resp. to Def. Harrison 10-12. As such, Plaintiff asserts that the "discovery rule" tolled the running of the statute until August 2017, when he was able to reasonably discover Defendants' wrongdoing. *Id.* at 12.

Under Pennsylvania law, actions in tort are generally subject to a two-year statute of limitations. 42 Pa. Cons. Stat. § 5524(7); *Mazza v. Bank of New York Mellon*, No. 20-3253, 2021 WL 601135, at *4 (E.D. Pa. Feb. 16, 2021). The limitations period begins to run once the right to institute the legal action arises. *Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983). Lack of knowledge, or the plaintiff's misunderstanding of the facts, does not toll the running of the statute. *Id.* The plaintiff has a duty to use all reasonable diligence to properly inform themselves of the facts which may give rise to their claim. *Id.* In other words, the plaintiff must institute a cause of action when they know, or should know, "sufficient critical facts to put him on notice that a wrong has been committed and that he need[s] to investigate to determine whether he is entitled to redress." *Comm. Network Int'l., Ltd. v. Mullineaux*, 187 A.3d 951, 961 (Pa. Super. 2018). Pennsylvania courts favor strict application of this statutory period. *Id.* Once the statute of limitations has expired, the plaintiff is barred from bringing suit absent an applicable exception which tolls the running of the statute. *Pocono Intern. Raceway*, 468 A.2d at 471.

The "discovery rule" operates as one exception that tolls the statute of limitations. *Mullineaux*, 187 A.3d at 961. To invoke this exception, the plaintiff must show that, despite the exercise of reasonable diligence, they were unable to know the injury or the cause thereof. *Pocono Intern. Raceway*, 468 A.2d at 471. A party has not exercised reasonable diligence "when [they] fail to make an inquiry when the information regarding the injury becomes available." *Mariner Chestnut Partners, L.P. v. Lenfest*, 152 A.2d 265, 279 (Pa. Super. 2016). This same standard applies in cases where the plaintiff asserts fraudulent concealment. *Rice v. Diocese of Altoona-Johnstown*,

212 A.3d 1055, 1068 (Pa. Super. 2019). In order to toll the limitations period under a fraudulent concealment theory, the plaintiff must show that the defendant "committed an affirmative, independent act of concealment upon which the plaintiff justifiably relied." *Id.* Application of this exception is generally a question of fact for the jury. *Mariner Chestnut Partners*, 152 A.2d at 279. However, where reasonable minds could not differ as to whether a party, through the exercise of reasonable diligence, knew or should of known of facts upon which a potential right to recovery is based, the discovery rule does not apply as a matter of law. *Mullineaux*, 187 A.3d at 962 (citing *O'Kelly v. Dawson*, 62 A.3d 414, 419-21 (Pa. Super. 2013)).

The Court finds that Plaintiff's claims regarding Defendants' purported efforts to conceal information about his taxes and the Trust are barred by the statute of limitations. The record evidence demonstrates that Plaintiff had full knowledge of Defendants' handling and preparation of his taxes for approximately nine years prior to instituting the present litigation. Likewise, Plaintiff had knowledge of the Trust's existence since at least December 2016, and accused Defendants of wrongfully withholding supporting tax documents from him in January 2017. Plaintiff also concluded that Defendant Harrison was wrongfully withholding distributions from the Trust no later than June 2017.

Defendant Harrison emailed Plaintiff a copy of his 2008 and 2009 state and federal tax returns on August 26, 2010. *See* JA 1140a. On October 30, 2011, Defendant Harrison emailed Plaintiff a copy of his 2010 state and federal tax returns. *Id.* at 1458a. Defendant Harrison emailed Plaintiff a copy of his 2011 state and federal tax returns on April 16, 2012. *Id.* at 1489a. On March 17, 2013, Defendant Harrison emailed Plaintiff a copy of his 2012 state and federal tax returns. *Id.* at 1521a-1522a. Defendant Unger emailed Plaintiff a copy of his 2013 tax returns on December 30,

2016. *Id.* at 1606a. Finally, Plaintiff authorized Defendant Unger to prepare his 2014 tax returns on January 11, 2017. [8] *Id.* at 1640a.

On January 4, 2017, Plaintiff sent an email to Defendant Unger requesting a copy of his 1099-B tax form and "other supporting documents from 2013." *Id.* at 1625a. Later that day, Defendant Unger sent a response stating that he did not have a copy of Plaintiff's 1099-B form and that he would need to obtain the original from his father. *Id.* Plaintiff later testified that it was around this time that he first concluded that Defendants were wrongfully withholding this information from him. *Id.* at 538a, 548:10-15. On January 11, 2017, Plaintiff sent an email to Defendant Harrison accusing him of refusing to provide his 1099-B form. *Id.* at 1639a-1640a. Plaintiff subsequently emailed Defendant Unger on January 19, 2017, thanking him for being "very helpful" and stating that Defendant Harrison would not turn over an original copy of his 1099-B form and other supporting tax documentation. *Id.* at 1626a.

Plaintiff testified that he became aware of the Trust's existence in April 2017. *Id.* at 159a, 129:9-160a, 130:5. However, in Plaintiff's email to Defendant Harrison on January 11, 2017, Plaintiff requested a copy of the Trust agreement. *Id.* at 1640a-1641a. According to Plaintiff, he had initially asked Defendant Harrison about the Trust on December 28, 2016 after noticing that Trust income had been reported on his 2013 tax return. *Id.* Plaintiff states that he had the opportunity to review the entire Trust document with JMS financial advisor Norman Mielziner sometime in April 2017. *Id.* at 160a, 130:2-5. On June 11, 2017, Plaintiff confronted Defendant Harrison via email regarding the Trust and accused him of wrongfully refusing to distribute the Trust principal, breaching his fiduciary duties, mishandling his taxes, and withholding tax information,

---

[8] Defendant Unger also sent Plaintiff copies of his state and federal tax returns for the years 2007-2009 on February 27, 2018 and March 26, 2018. *See* JA 1699a-1703a. When Plaintiff asked for a copy of his 2005 and 2006 returns, Defendant Unger explained that the firm does not maintain records dating back to those years. *Id.* at 1701a.

including his 1099-B form.  *Id.* at 1669a-1776a.  Plaintiff also threatened legal action against Defendant Harrison.  *Id.*

Aside from undermining Plaintiff's assertions that Defendants withheld tax information from him, the record evidence demonstrates that since at least January 2017, Plaintiff had knowledge of the material facts underlying his fraud claims as they pertain to his tax returns and administration of the Trust.  Plaintiff concluded that Defendants were withholding critical information from him, and that Defendant Harrison was mishandling his taxes and the Trust, well before July 8, 2017. Plaintiff's claim that Defendants concealed their wrongdoing under the guise of good faith[9] is insufficient to toll the statutory period.  Blind reliance and the failure to conduct even a cursory examination of the facts which may give rise to a cause of action precludes invocation of the discovery rule.  *See Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 840 (Pa. Super. 2005). Plaintiff's right to pursue legal action regarding his claims that Defendants fraudulently withheld tax documents, filed his taxes without his consent,[10] reported inaccurate income figures on his personal taxes,[11] and concealed the existence of the Trust, arose more than two years prior to the filing of the Complaint.  Likewise, Plaintiff offers no evidence to suggest that Defendants actions prevented him from otherwise exercising reasonable diligence in determining whether he was entitled to redress. These claims are therefore barred under the statute of limitations.

---

[9] *See* Pl. Resp. to Def. Harrison Mot. 13.

[10] Plaintiff also contends that Defendant Harrison improperly reported Plaintiff as a dependent on his taxes.  Pl. Resp. to Def. Harrison Mot. 14.  Aside from failing to detail the timeframe in which this supposedly occurred, Plaintiff offers no supporting evidence for this allegation.  *Id.*  It is also worth noting that Defendant Harrison paid at least a portion of Plaintiff's college tuition and that Plaintiff remained unemployed following his graduation from college in 2012 until at least 2015.  JA 77a, 47:1-84a, 54:1; 272a, 242:20-273a, 243:2.

[11] According to Plaintiff, Defendant Harrison also defrauded him by embezzling $6,500 in State of Israel Bonds and laundered them through an account with BNY Mellon.  Compl. ¶ 27.  Defendant Harrison testified that Plaintiff received these bonds as a gift from his grandparents, and that it was their intention that the money be spent in Israel.  JA 927a, 138:16-929a, 140:10.  Pursuant to these wishes, Defendant Harrison purportedly cashed these bonds and used the money to finance Plaintiff's trip to Israel in February 2010.  *Id.*  Defendant Harrison reported this transaction on Plaintiff's 2010 tax returns.  *See id.* 1467a-1470a.  Plaintiff therefore had access to information concerning the expenditure of these funds since October 30, 2011, approximately six years beyond the statutory period.  *Id.* at 1458a.  Accordingly, Plaintiff's claims concerning these bonds are barred by the statute of limitations.

Plaintiff also alleges that Defendant Harrison fraudulently opened an HSA account in Plaintiff's name in order to launder money and obtain improper tax deductions. Compl. ¶ 21-24. However, the record contains no evidence of money laundering or that Defendant Harrison benefitted from a tax deduction by opening this account. Plaintiff has also failed to identify any misrepresentation concerning this HSA account upon which Plaintiff relied to his detriment. Additionally, the evidence in the record suggests that Plaintiff suffered no injury as a result of this transaction.

Sometime in 2013, Defendant Harrison opened a joint HSA account with Bancorp in both his and Plaintiff's names. JA 917a, 128:16-24; 1926a. Defendant Harrison alleges that, at the time, he was paying for Plaintiff's medical expenses. *Id.* at 918a, 129:17-919a, 130:5. According to Plaintiff, the money in the HSA account came from Defendant Harrison's medical business checking account. *Id.* at 197a, 167:12-24. The record evidence also shows that Defendant Harrison wrote personal checks to the account on April 17, 2014 and January 6, 2015. *Id.* at 2018a. Defendant Harrison testified that he was attempting to create a tax deduction for Plaintiff, but ultimately never used the account for that purpose because Plaintiff was not earning any income. *Id.* at 917a, 128:20-918a, 129:6. After concluding that the HSA account could not be utilized for tax purposes, Defendant Harrison testified that he withdrew the money that he had personally deposited. *Id.* at 918a, 129:17-919a, 130:5.

In addition to claiming no tax deduction on Plaintiff's behalf, Defendant Harrison also testified that he never used the HSA account to claim a tax deduction for himself. *Id.* at 922a, 133:1-6. Plaintiff admits that he has never seen any tax documents showing that Defendant Harrison took a deduction in connection with this account. *Id.* at 199a, 169:18-201a, 171:14. Instead, Plaintiff avers that "it's my contention that Ted took a tax deduction for that HSA…[based] on the fact that it…clearly should have been applied to my taxes, but was not, and then instead was deducted from

Ted's taxes improperly." *Id.* at 191a, 161:3-13. Plaintiff further reasons that once Defendant Harrison transferred his money into the HSA account, it became Plaintiff's money. *Id.* at 192a, 162:14-15. Such circular and conclusory reasoning does not raise a genuine factual dispute regarding the HSA account. *Presbyterian Med. Ctr.*, 832 A.2d at 1072. Plaintiff has the burden of offering facts "which will enable the court to draw an inference of fraud, and allegations in the form of conclusions or impermissible speculation as to the existence of fraud are insufficient." *Alvarez v. Ins. Co. of North America*, 313 F. App'x 465, 468-69 (3d Cir. 2008) (citation omitted).

Plaintiff also provides no evidence as to any misrepresentation or omission by Defendants concerning the HSA account. Likewise, the record lacks any indication that Plaintiff relied on any such intimations to his detriment. In fact, Plaintiff received a reimbursement check totaling $6,566.77 from the HSA account on May 17, 2018. Compl., Ex. A. The Court is unable to discern how Plaintiff was harmed by the existence of a joint HSA account, the contributions to which came exclusively from Defendant Harrison, or upon what basis Plaintiff has concluded that Defendant Harrison or the Accountant Defendants personally profited from it at his expense. Therefore, Plaintiff's claim concerning the HSA account is to no avail.

Plaintiff also contends that Defendant Harrison fraudulently created a credit card in Plaintiff's name without his knowledge or consent. Compl. ¶ 39. Defendant Harrison purportedly gave Plaintiff a Citibank credit card in 2008 to provide him with money to spend. JA 832a, 43:23-833a, 44:16. According to Defendant Harrison, this card was in both his and Plaintiff's name and the funds used to pay for purchases were drawn from Defendant Harrison's personal bank account. *Id.* at 834a, 45:9-11; 836a, 47:11-13. Defendant Harrison testified that he terminated the credit card

in 2009 after discovering that Plaintiff had been using it to create a marijuana farm in the woods behind their house.[12]  *Id.* at 835a, 46:7-21.

During his deposition, Plaintiff acknowledged that he made no balance payments on the Citibank credit card.  *Id.* at 663a, 716:13-16.  Aside from this testimony, Plaintiff offers no argument, or evidence, demonstrating that Defendant Harrison or the Accountant Defendants defrauded him in connection with this account.  Plaintiff merely denies receiving the credit card in his Response to Defendant Harrison's Motion.  *See* SDF ¶ 82-83, ECF No. 121-4.  This is an insufficient evidentiary basis for finding a genuine dispute of material fact because Plaintiff cannot "rest upon the mere allegations or denials of [his] pleadings."  *Szostek v. Drexel University*, No. 12-2921, 2013 WL 4857989, at *6 (E.D. Pa. Sept. 11, 2013) (citing *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)).  As with the HSA, the Court is unable to perceive how Defendant Harrison's use of his own funds to finance a credit card for Plaintiff's purported benefit evidences a fraudulent scheme, or a misrepresentation which caused Plaintiff harm.

Plaintiff further alleges that Defendant Harrison made fraudulent withdrawals from the Trust totaling $75,000.  Compl. ¶¶ 36-37.  In support of this contention, Plaintiff offers two client account summaries from the Trust reflecting a $50,000 withdrawal on December 10, 2010 and a $25,000 withdrawal on September 7, 2011.  *Id.*, Ex. B, C.  Defendant Harrison testified that he made these withdrawals to cover the cost of Plaintiff's expenses, including his college tuition.  JA 855a, 66:23-858a, 69:24; 864a, 75:14-17.  An expense schedule submitted by Defendant Harrison shows that from 2002 to 2014, Defendant Harrison paid $205,546.10 in support of Plaintiff.  *Id.* at 1350a.  These expenses included the cost of Plaintiff's health insurance, credit card, and college tuition.[13]

---

[12] Defendant Harrison states that he "discovered Michael had used the funds, which I was giving him, and he created a marijuana farm in the woods behind my house. He bought a tent, he bought a machete, he cleared areas, and I discovered a tent filled with marijuana…that's the reason why the card was terminated." JA 835a, 46:7-21.

[13] Plaintiff acknowledges that Defendant Harrison paid at least part of his college tuition.  Specifically, Plaintiff testified that "Ted only paid about four to four and a half years of my six years of college." JA 272a, 242:20-273a, 243:2. Plaintiff obtained a bachelor's degree in finance from the University of Maryland in 2012.  Acct. Def. SUF ¶ 7.

*Id.* During this period, the expense schedule shows that Defendant Harrison made five withdrawals from the Trust, including those on December 10, 2010 and September 7, 2011, for a total of $145,859.73. *Id.*

The terms of the Trust authorize Defendant Harrison to "in his discretion…make payments from principal in such amounts as he deems appropriate for Michael's health, support, maintenance, and education, up to the entire principal amount." *Id.* at 1389a. Likewise, the Trust empowers Defendant Harrison to "deduct, retain, expend, and pay out of any money belonging to this trust any and all necessary or property expenses in connection with the operation of this trust." *Id.* at 1394a. Plaintiff offers no evidence to support his contention that Defendant Harrison made fraudulent withdrawals from the Trust. He likewise has failed to counter Defendant Harrison's evidence showing that his withdrawals were made pursuant to his authority to reimburse himself for the costs incurred in the course of supporting Plaintiff's health, welfare, and education. In fact, the expense schedule shows that Defendant Harrison spent $59,686.37 *in excess* of what he ultimately withdrew from the Trust during this period. *Id.* at 1350a. Plaintiff provides no explanation as to how a Trustee's withdrawal of *less* funds than he is authorized to recover in support of Plaintiff's lifestyle is fraudulent or how it caused Plaintiff harm.[14]

In his final fraud allegation, Plaintiff contends that Defendant Harrison attempted "numerous times to convert [the Trust] to his personal assets for his continued beneficial interest…constituting schemes to defraud in violation of 18 U.S.C. § 1343." Pl. Resp. to Def. Harrison Mot. 14. On January 25, 2017, Defendant Harrison sent a letter to JMS financial advisor Norman Mielziner requesting a transfer of all Trust funds from an account listed under the name "T Harrison Ttee FBO

---

[14] In his Motion for Partial Summary Judgment against Defendant Harrison, Plaintiff claims that "Dr. Harrison never dispersed [sic] one penny of the Trust directly to Plaintiff in accordance with the Trust." Pl. Mot. 8, ECF No. 99. It is unclear whether this is in reference to Defendant Harrison's refusal to distribute one third of the trust principal, discussed *supra* Section IV(a), or whether it is his contention that Defendant Harrison never used funds from the Trust to Plaintiff's benefit. Regardless, Plaintiff has offered no evidence to counter the expense schedule submitted by Defendant Harrison, and thus cannot substantiate a claim asserting the latter.

Michael Harrison," to a separate account, listed under the name "Theodore J. Harrison." Pl. Mot., Ex. F, ECF No. 99. Mr. Mielziner subsequently advised Defendant Harrison that his transfer application was denied because it was against JMS policy to transfer trust accounts to personal accounts. *Id.*, Ex. E, 19:18-20:11. Defendant Harrison then attempted to transfer the Trust funds to a new trust account with E*Trade on May 7, 2017.[15] *Id.*, Ex. G. Before completing this process, Defendant Harrison decided not to open the account with E*Trade and instead transferred the Trust funds to an account with Citibank on June 19, 2017. *Id.*, Ex. E.

Plaintiff concludes that Defendant Harrison transferred the Trust funds to the Citibank account "for his own benefit, as opposed to a Trust account for Plaintiff's benefit." Pl. Mot. 4, ECF No. 99. According to the Citibank transfer application, submitted by Plaintiff himself, the name listed on the Citibank account is "Theodore Harrison Trustee F/B/O Michael E. Harrison." *Id.*, Ex. E. Plaintiff provides no explanation as to how this evidence, which shows that Defendant Harrison opened the account as Trustee for the benefit of (FBO) Michael Harrison, proves that Defendant Harrison tried to convert these funds for his own benefit. Regardless, the Trust instrument specifically authorizes Defendant Harrison "[t]o hold securities or other properties in the name of a nominee or in another form not indicating the fiduciary ownership thereof." JA 1394a. Plaintiff has failed to offer any evidence showing that Defendant Harrison's transfer of the Trust funds was part of a fraudulent scheme which caused Plaintiff harm. As there is no genuine dispute of material fact concerning these allegations of fraud, dismissal of Count II of the Complaint is appropriate.

---

[15] Plaintiff accuses Defendant Harrison of attempting to alter the Trust registration title in the E*Trade account to "Theodore J. Harrison Ttee FBO Theodore J. Harrison." Pl. Mot. 4, ECF No. 99. In support of this contention, Plaintiff cites an expert report prepared by David H. Glusman on November 4, 2020. *Id.* Mr. Glusman's report states in relevant part that "Theodore attempted to transfer the Trust to his personal assets at E*Trade by changing the Trust's registration from 'THEODORE J. HARRISON TTEE FBO MICHAEL E HARRISON' to 'THEODORE J HARRISON TTEE FBO THEODORE J HARRISON.'" *Id.*, Ex. I at 2. The only evidence the report cites to corroborate this contention is the deposition of Norman Mielziner. *Id.* The portion of the deposition cited has nothing to do with the E*Trade account. *See* JA 1234a, 19:18-1235a, 20:11. Plaintiff has thus provided no evidence showing that Defendant Harrison attempted to make himself the beneficiary of the Trust. Furthermore, the E*Trade transfer application, submitted by Plaintiff himself, shows no such attempt by Defendant Harrison. *See* Pl. Mot., Ex. G, ECF No. 99.

### ii. Conspiracy to Commit Fraud

To maintain an action for civil conspiracy, the plaintiff must demonstrate (1) a combination of two or more individuals acting with a common purpose to perform an unlawful act, or a lawful act through unlawful means, or for an unlawful purpose; (2) an overt act in furtherance of that common purpose; and (3) actual legal damage. *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003). "[A] civil conspiracy claim requires a valid underlying tort claim." *Banks v. Rozum*, 639 F. App'x 778, 784 (3d Cir. 2016). In other words, civil conspiracy claims only remain viable as long as the substantive allegations of unlawful conduct survive dismissal. *Feingold v. Graff*, 516 F. App'x 223, 227 (3d Cir. 2013). Therefore, when the underlying claims are dismissed on summary judgment, the civil conspiracy claim must fail as well. *Id.* Having determined that Plaintiff cannot sustain his cause of action for fraud, the Court finds that Plaintiffs claim for conspiracy to commit fraud must also be dismissed.

### iii. Constructive Fraud

Claims for constructive fraud require a showing of a breach of fiduciary duty through false statements or omissions upon which the party to whom the duty is owed relies to their detriment. *Dille*, 2020 WL 7624835, at *15. Unlike fraud, constructive fraud claims are not predicated on dishonest intent. *Id.* Instead, a party may be found liable for a material nondisclosure if they had an affirmative duty to speak. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 611 (3d Cir. 1995). The duty to speak may arise where a confidential or fiduciary relationship exists between the parties. *Alvarez*, 313 F. App'x at 469.

The Parties appear to each concede that, as Trustee, Defendant Harrison owed a fiduciary duty to Plaintiff. However, Plaintiff's claim for constructive fraud merely restates the allegations underlying his fraud claim. The only omission to which Plaintiff refers is Defendant Harrison's purported efforts to "conceal[] the Trust and the Settlor's intentions from Plaintiff for years." Pl.

Resp. to Def. Harrison Mot. 16.  Having learned of the Trust's existence more than two years prior to instituting the instant case, this claim is barred by the statute of limitations.  *See Riggs v. AHP Settlement Trust*, 421 F. App'x 136, 138 n.2 (3d Cir. 2011) (citing 42 Pa. Cons. Stat. § 5524(7)).

Plaintiff also maintains that Defendant Harrison made misrepresentations to Plaintiff by stating his intent to settle the Trust dispute.  Pl. Resp. to Def. Harrison Mot. 16.  In support of this contention, Plaintiff points to an email from June 19, 2017, wherein Defendant Harrison expressed his assent to Plaintiff's proposal to resolve their outstanding disagreement over the Trust.  *See id.* (citing Compl., Ex. D).  Plaintiff appears to contend that Defendant Harrison was somehow trying to deceive Plaintiff because, that same day, he transferred the Trust principle to a new account.  *Id.*  It is unclear how this constitutes a misrepresentation since Defendant Harrison listed the new account under the name "Theodore Harrison Trustee F/B/O Michael E. Harrison."  Pl. Mot., Ex. E, ECF No. 99.  Also fatal to Plaintiff's claim is the fact that he identifies no injury resulting from this purported misrepresentation.  *See Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 784 (E.D. Pa. 2008).  Plaintiff has therefore failed to raise a genuine factual dispute concerning his claim for constructive fraud, subjecting Count IV to dismissal.

### e. Intentional Infliction of Emotional Distress

Plaintiff alleges that he has suffered emotional distress as a result of his father's actions prior to, and during the course of, this lawsuit.[16]  Compl. ¶ 87.  As a result, Plaintiff claims that he has suffered weight loss, sleep disturbances, and muscle problems in his neck.  *Id.*  Plaintiff also claims that Defendant Harrison's outrageous conduct has "significantly exasperated [sic]" his previously diagnosed Post Traumatic Stress Disorder ("PTSD").  Pl. Resp. to Def. Harrison Mot. 16.  Defendant Harrison contends that Plaintiff's claim fails as a matter of law.  Def. Harrison Mot.

---

[16] Plaintiff states that the evidence of Defendant Harrison's outrageous conduct can be found throughout Plaintiff's Response to Defendant Harrison's Motion, in Plaintiff's Motion for Summary Judgment, and in Plaintiff's deposition testimony.  Pl. Resp. to Def. Harrison Mot. 16.

19-20. According to Defendant Harrison, Plaintiff's contention that he became severely distressed after reading a letter from his father's attorney falls short of the requisite extreme or outrageous conduct necessary to sustain this claim. *Id.* at 20. Furthermore, Defendant Harrison argues that Plaintiff's purported injuries are completely uncorroborated by any record evidence. *Id.*

To prevail on a claim for intentional infliction of emotional distress, the plaintiff must establish that the defendant's conduct (1) was extreme and outrageous; (2) was intentional or reckless; (3) caused emotional distress; (4) and that the distress was severe. *Valley Nat'l Bank v. Engle Eyewear, Inc.*, No. 1096 MDA 2017, 2019 WL 1976026, at *7 (Pa. Super. May 1, 2019) (quoting *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998)). "Pennsylvania reserves this tort for the worst conduct imaginable." *Wartluft v. Milton Hershey School and School Trust*, 844 F. App'x 499, 504 (3d Cir. 2021). To that end, a defendant may only be found liable for behavior that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Likewise, the plaintiff must show that they suffered physical injury through competent medical evidence. *Lamb v. CVS Health*, No. 21-638, 2021 WL 2186256, at *5 (E.D. Pa. May 28, 2021).

The Court finds that Plaintiff has failed to demonstrate that Defendant Harrison engaged in extreme or outrageous conduct, or that Plaintiff suffered severe emotional distress. During his deposition, Plaintiff testified that the Answer filed by Defendant Harrison in the instant case caused him emotional distress because it contained the statement, "Theodore, upon information and belief, is Plaintiff's father." JA 276a, 246:18-277a, 247:10. Plaintiff reasoned that this statement evidenced Defendant Harrison's intent to inflict emotional distress upon him because it "sought to mess with [his] identity" by suggesting that his mother may have had an affair with another man. *See id.* When confronted with the fact that the Answer was filed subsequent to the Complaint

containing allegations of intentional infliction of emotional distress, Plaintiff then shifted gears and stated that his emotional distress resulted from a "ten-page threatening letter" sent by either his mother or father on August 6, 2017. *See id.* at 279a, 249:20-285a, 255:8. Plaintiff later claimed that he was mistaken, and that the actual source of his emotional distress was a letter sent by Dr. Harrison's attorney in a related state matter to Plaintiff's attorney on September 17, 2018.[17] *Id.* at 285a, 255:9-287a, 257:16. Finally, Plaintiff alleged that he has suffered emotional distress "[a]cross the board from day one learning about this until present day." *Id.* at 287a, 257:5-257:16.

Regardless of which version of his evolving narrative one chooses to credit, none of the allegations offered by Plaintiff constitute extreme or outrageous conduct. Asserting a fact based "upon information and belief" is a standard form of pleading whereby the attorney of record certifies that their representations to the court have an evidentiary foundation.[18] *See* Fed. R. Civ. P. 11(b). Plaintiff cites no case law to support the proposition that such filings constitute "the worst conduct imaginable." *Wartluft*, 844 F. App'x at 504. Likewise, the Court is unable to discern how one attorney's letter to another concerning potential litigation renders their client liable for conduct which

---

[17] Defense counsel sent this letter in response to a correspondence from Plaintiff's counsel concerning the Parties' ongoing dispute over distributions from the Trust. *See* JA 1873a-1875a. The letter states in relevant part that although Dr. Harrison "does not wish to make Michael's personal issues and struggles a matter of public discussion, and would prefer to keep them private and part of a family discussion," the tone of Plaintiff counsel's previous letter requires a full discussion regarding Dr. Harrison's concerns over distributing trust funds to Plaintiff. *See id* at 1873a. The letter further states that:

> Given his struggles with drug addiction and his ADHD, as well as his inability to manage money, his illegal use of money to purchase and deal drugs, his father is simply not comfortable that Michael can manage the monies in trust for him, and as such has elected to delay distribution to him until Michael is in a better position in life…In the meantime, his father will certainly make distributions from income, and to the extent necessary, from principal, to pay for Michael's medical insurance, should he do what is necessary to obtain it. His father is also willing to make distributions to facilitate Michael obtaining drug treatment…Both of his parents are also willing, and are representing by this letter, that the family participate in a family counseling in an attempt to work through some of these issues together in a healthy manner. They would be happy to pay the expense of that from their own pockets…If you wish to proceed in a legal manner, I will respond accordingly at that time. Otherwise, I encourage Michael to reach out to his parents, who love him with all their heart, to discuss family counseling and the other items I mentioned above.

> *Id.* at 1874a.

[18] Indeed, Plaintiff's counsel uses this very language in the Complaint. *See, e.g.*, Compl. ¶¶ 25, 42.

is "atrocious and utterly intolerable in a civilized society." *McGreevy*, 413 F.3d at 371. Adopting Plaintiff's position would subject virtually every licensed attorney, and those who utilize their services, to liability for intentional infliction of emotional distress. Plaintiff also appears to claim that his emotional distress derives from his father's administration of the Trust. Notwithstanding the conclusory nature of this allegation, the Court finds that generalized claims of trust mismanagement do not evidence extreme or outrageous conduct. *See, e.g.*, *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274-75 (3d Cir. 1979) (finding outrageous conduct where a doctor knowingly misdiagnosed a professional athlete with a disease that forced him to end his career); *Papieves v. Lawrence*, 263 A.2d 118, 121 (Pa. 1970) (holding that the driver of a vehicle engaged in extreme and outrageous conduct by striking a pedestrian and burying the body to conceal it from the victim's family).

Plaintiff's claim must also fail due to the absence of any medical evidence to corroborate his purported injuries. During his deposition, Plaintiff claimed to have lost sleep and suffered neck pain to such a degree that he could not move for three days.[19] JA 282a, 252:17-283a, 253:3. Aside from referencing his previously-diagnosed PTSD from an unrelated incident in 2013, Plaintiff offers no supporting evidence for this alleged harm. In fact, Plaintiff testified that he has not consulted any physicians regarding his purported neck pain or trouble sleeping.[20] *Id.* at 306a, 276:13-24. Plaintiff has therefore failed to offer any evidence demonstrating that he sustained physical injuries as a result of Defendant Harrison's conduct. Having shown that there is no genuine dispute of material fact

---

[19] When asked whether he considered a letter stating that his parents were willing to pay for his health insurance, drug rehabilitation, and family counseling to be such a threat that it caused him to be unable to move or to sleep for three days, Plaintiff replied, "Absolutely, I do." JA 288a, 258:16-24.
[20] Plaintiff stated that he has not yet done so because he "h[as] a lot going on right now," but he intends to consult a doctor after the present matter has been resolved. JA 306a, 276:13-24. Additionally, Plaintiff stated that he does not "know the full range of the damages that [have] been done" or which type of medical professional could address his symptoms. *Id.*

regarding Plaintiff's claim for intentional infliction of emotional distress, Defendant Harrison's Motion is granted as to Count V.

### f. Gross Negligence

Plaintiff alleges that Defendant Harrison breached his duty as Trustee "by acting in a grossly negligent manner in both his dealings with Plaintiff's Trust and Plaintiff's taxes." Compl. ¶ 98. According to Plaintiff, Defendant Harrison's failure to keep an accounting for the Trust, his decision to allow the Trust to report income under Plaintiff's social security number, comingling Trust assets with his own, and failing to keep records of Trust expenses "rise[s] to the level of gross negligence at the very least." Pl. Resp. to Def. Harrison Mot. 19. Likewise, Plaintiff contends that the Accountant Defendants "breached their fiduciary duties by acting in a grossly negligent manner." Compl. ¶ 103. Plaintiff avers that "[g]iven the totality of failures and outright violations of professional responsibility…it is without question that the conduct of the Accountant Defendants rises to the level of gross negligence, at the very least, as a matter of law." Pl. Mot. 9, ECF No. 100.

Gross negligence is a theory of liability encompassed within a general cause of action for negligence. *In re Scheidmantel*, 868 A.2d 464, 484-85 (Pa. Super. 2005). In order to maintain a negligence claim, the plaintiff must allege facts which demonstrate (1) a legally recognized duty on behalf of the defendant; (2) the defendant's breach of that duty; (3) a causal connection between the defendant's breach and the resulting injury to the plaintiff; and (4) actual loss or damage to the plaintiff. *Green v. Pennsylvania Hosp.*, 123 A.3d 310, 315-16 (Pa. 2015). A breach of duty occurs when "the defendant's act or omission [falls] below the standard of care and…increase[s] the risk of harm to the plaintiff." *Id.* at 316. To prove causation, the plaintiff must show "that the increased risk was a substantial factor in bringing about the resultant harm." *Id.* These elements need not be proven by means of direct evidence, but may be inferred from facts and circumstances which give

rise to a reasonable inference of negligent conduct. *See Bennet v. Dollar General, Inc.*, No. 19-03214, 2020 WL 3964971, at *3 (E.D. Pa. July 13, 2020).

Tortious conduct amounting to gross negligence requires an "extreme departure from ordinary care." *Feleccia v. Lackawanna College,* 215 A.3d 3, 20 (Pa. 2019). The defendant's conduct must amount to a "want of even scant care," and a flagrant deviation from a duty owed to another. *Id.* Ultimately, the defendant must exhibit a reckless disregard of their obligations to another, in addition to the consequences resulting therefrom. *Id.* Whether a given set of circumstances constitutes gross negligence is generally a question of fact for the jury. *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164-65 (Pa. 1997). However, the court may decide the issue as a matter of law when "the case is entirely free from doubt" and no reasonable jury could reach a finding of gross negligence. *Id.* at 1165.

Plaintiff states that although it is his position that "Dr. Harrison's conduct…should be found to be intentionally fraudulent and a breach of fiduciary duty, Plaintiff has alleged in the alternative that Dr. Harrison's actions and inactions rise to the level of gross negligence at the very least." Pl. Resp. to Def. Harrison Mot. 19. Likewise, Plaintiff asserts that the Accountant Defendants' breach of their fiduciary duty "unquestionably rises at least to the level of gross negligence." Pl. Resp. to Acct Def. Mot. 16. These conclusory assertions are wholly inadequate to sustain Plaintiff's claims. Not only has Plaintiff failed to substantiate the allegations underlying his claims for gross negligence, Plaintiff makes no attempt to explain how these actions constitute an "extreme departure from ordinary care." Merely asserting that conduct was "at least" grossly negligent does not make it so, and it certainly does not provide an evidentiary basis upon which a reasonable jury could reach a finding in Plaintiff's favor. Accordingly, Counts VIII and IX are dismissed.

## V.    CONCLUSION

Plaintiff's claims for breach of fiduciary duty are not only time-barred, but Plaintiff has failed to establish the requisite elements necessary to sustain these claims.  Accordingly, Plaintiff's claims for aiding and abetting breach of fiduciary duty are also without merit.  Plaintiff's RICO claims must fail because he has not established that Defendants maintained an associated-in-fact enterprise, that they engaged in an ongoing pattern of racketeering activity, or that Plaintiff suffered harm as a result of Defendants' alleged racketeering activity.  Each of Plaintiff's allegations underlying his fraud claims are either barred by the applicable statute of limitations or unsupported by the record evidence.  Plaintiff's claims for conspiracy to commit fraud and constructive fraud are to no avail for the same reasons.  As to his claim for intentional infliction of emotional distress, Plaintiff has not demonstrated that Defendant Harrison engaged in extreme or outrageous conduct or that Plaintiff suffered physical harm as a result.  With regards to his claims for gross negligence, Plaintiff has offered neither argument nor evidence showing an extreme departure from ordinary care.  Having demonstrated the absence of any dispute of material fact regarding the foregoing claims, Defendants' Motions for Summary Judgment are granted, and Plaintiff's Motions are denied.  An appropriate Order follows.


BY THE COURT:



*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge